UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
--------------------------------------------------------X
SKIPPY FISH BAIT CO., and LOU
CONSOLI,

                Plaintiffs,

      -   Against    -                      **COMPLAINT AND JURY DEMAND**

HARVEST DIRECT, LLC, and
SIMON GEORGE,

                Defendants.
--------------------------------------------------------X

       Plaintiffs, by their attorneys, The Wagner Law Group, P.C., as and for their Complaint and Jury Demand, respectfully allege as follows:

## NATURE OF THE ACTION

       1.     This is an action arising out of the Defendants' fraud, breach of contract, negligence, conversion, deceit, deception, deliberate, and willful misconduct. As a result of the Defendants' misconduct, the Plaintiffs have been caused to suffer significant financial harm.

## THE PARTIES AND JURISDICTION

       2.     At all relevant times hereto, the Plaintiff, Skippy Fish Bait Co., ("Skippy") is a legal entity organized by Lou Consoli ("Consoli"). Skippy  and Consoli are referred to collectively as ("Consoli"). Consoli is located in Alabama.

       3.     At all relevant times hereto, the Defendant, Harvest Direct, LLC., ("HD") is a Massachusetts limited liability company with its principal offices located at 61 Accord Park Drive, Norwell, Massachusetts.

       4.     At all of the relevant times hereto mentioned, Defendant Simon George ("George") is the President of HD.

       5.     The federal court has jurisdiction based upon diversity.

## BACKGROUND

6.      Consoli began competing in tournament bass fishing in 1989.

7.      Consoli earned the title "Rookie of the Year" by the MBAA tournament organization in 1989, at the age of 17.

8.      Consoli continued in the professional bass fisherman tour while securing sponsorships from major corporations such as Zebco, Quantum, and Motor Guide.

9.      In 1995 Consoli began to host an outdoor radio show, Pro Tour USA's "On the Water" which drew an audience of more than 1.3 million people over a two year period.

10.      Consoli has been featured on radio stations such as ESPN, Fox Sports, and WNPV.

11.      Consoli has made television appearances on SportsLine.

12.      Consoli has been featured in numerous newspapers and magazines.

13.      More than 15 million television viewers watch professional bass fishing each year.

14.      Upon information and belief, 5.7 million read Bassmaster and FLW magazine each month.

15.      More than 9 million people visit bass fishing websites.

16.      Consoli formed Skippy in 2007 which manufactures and sells products including the SkippyFISH lures.

17.      In 2009 Consoli obtained Trademark protection for SkippyFISH and also obtained copyright protection for instructional materials, packaging, and a television commercial.

18.      By 2010 Consoli was selling SkippyFISH  in ten (10) countries.

19.     In 2011 Consoli began to conduct research regarding the direct response industry in order to determine the feasibility of promoting SkippyFISH in that space.

20.     The research included, meeting with various companies in the industry including, but not limited to, Icon Media, Liquid Focus, and Voice Genic, LLC.

21.     All of the feedback was that Consoli had a product with tremendous potential.

22.     Consoli created an infomercial with Joe Thomas ("Thomas") and Jim Kramer ("Kramer"), two professional bass fishermen.

23.     Thomas and Kramer have their own television show and have been in the industry for more than thirty years.

24.     The infomercial was created.

25.     Consoli then hired the media buy company, inbound telemarketing company, and the website company.

26.     Consoli invested the necessary funds to do a media buy and to test the product over multiple networks, including but not limited to, National Geographic, ESPN, Fox Sports South, Discovery Channel, Outdoor Channels, Sportsman Channel.

27.     Upon information and belief, a ratio of 2 to 1 is considered break even. A ratio of 2.8 to 1 and higher is considered to be successful. It is also common to tweak the message and air times in order to increase sales.

28.     The "experts" that Consoli were using all felt that this was a very good opportunity.

29.     As of October 2012 the numbers that were produced from tests of the product on the market were extremely successful.

30.     As a result, Consoli contacted Jack Desalvo ("Desalvo") in October of 2012 to let him know that the numbers produced were successful.

31.     Desalvo reached out to Simon George ("George") who ran HD.

32.     Upon information and belief, Desalvo talked with George about Consoli's background as a professional angler and that Consoli had developed and protected a unique product that did very well in the market place with a small media span based off of the resources that he had available to test and put the project into place.

33.     Thereafter, Consoli had several conversations with George regarding the product and Consoli's background.

34.     Consoli also had conversations with the telemarketing company and the website development company for this project.

35.     By fall 2012 George expressed interest in the product.

36.     At the same time, Consoli spoke with Icon Media and expressed his desire to get the product into the hands of professionals that do this all day long, the large infomercial companies.

37.     Telebrands also expressed interest in working with Consoli based upon their understanding of Consoli's background, tests of the product, and the anticipated demand for SkippyFISH.

38.     George was aware that Telebrands was interested in Consoli's project.

39.     Consoli met with George and Tim Kensinger ("Tim") one week prior to a scheduled meeting with Telebrands.

40.     During that meeting Consoli showed them the video of the infomercial, fishing lure kit, and talked about the product and the project.  Consoli also showed them: the numbers

from the cost sheets from the media span; the data; the information from the call center; and information from the website sales.

41.     George said that HD had a very strong interest in moving forward.

42.     Consoli told George during the meeting that he was scheduled to meet with Telebrands the next week.

43.     George said that he liked the project and wanted Consoli to move forward with HD.

44.     George suggested that the parties enter into a term sheet.  Consoli responded that he wanted to keep his appointment with Telebrands. In response, George asked Consoli to stay in Boston and to meet with him the next day. George expressed tremendous desire in moving forward with the project and that he wanted to hit the ground running with this project.

45.     George asked if there was any reason why Consoli didn't want to do business with him. George also said that he had a great relationship with several large retail companies that would work to Consoli's advantage.

46.     During the conversations that day George said that Consoli would earn at least $2,000,000 within one (1) year through his efforts.

47.     George said that Telebrands was not going to give Consoli nearly what George was going to give to him. In addition, Telebrands was going to tell Consoli everything that he wanted to hear and that Telebrand would the mess up the project and that could not be trusted.

48.     As a result, Consoli cancelled his meeting with Telebrand.

49.     HD was happy that Consoli cancelled with Telebrand and that there was no more competition.

50.     Consoli and HD entered into a term sheet and Consoli agreed to stay in Boston overnight.

51.     At HD's request, Consoli contacted the companies that he had contracted with for the project and advised them that HD would be taking over the contracts and agreements and that they should expect to hear from HD and specifically, George.

52.     Consoli signed his rights and control over the project to HD.

53.     As a result, Consoli could no longer sell or market SkippyFISH.

54.     Telebrand increased its offer in an effort to get Consoli to do business with them.

55.     The offer remained significantly lower than what HD had offered and, as a result, Consoli stayed with HD.

56.     It is now apparent that HD made an offer that it never intended to keep and that was well above market value. This was done in an effort to lure Consoli in with no intent to honor its terms. In short, HD made gross, willful misrepresentations.

57.     A contract between Consoli and HD was drafted but it was never executed.

58.     Despite that, Consoli had signed away his rights to his product and made every good faith effort to support HD in what he believed was a critical venture for the future of Consoli and his product.

59.     HD promised to invest money into getting this thing started.

60.     HD made promises to Consoli about next steps.

61.     However, there did not seem to be any progress.

62.     HD learned that Consoli reached out to Telebrand. In response, HD indicated that results from some studies were not very good and that they were going to hold off on advertising for a little while.

63.     Consoli has just learned that HD did not make an appropriate effort in marketing the product and, as a result, did not have adequate samples to work with.

64.     In accordance with the term sheet and verbal representations, HD was responsible to fill all of the orders. However, Consoli received several calls from the customer service number that people were not receiving the product.  Customers indicated that they had paid for orders and did not receive their kits.

65.     HD had more than $6,500 worth of product that Consoli had shipped to them and that was available to be sent to customers.

66.     This resulted in lost sales and lost revenue. In addition, this had a negative impact on the brand that Consoli had worked hard to create.

67.     At HD's request, Consoli began to fill orders that should have been handled by HD.  Consoli ran their credit cards, processed the payments, created the invoice, and sent the packages from the post office. HD promised to handle subsequent orders.

68.     HD did not keep their promise and Consoli was still filling orders that were supposed to be handled by HD.

69.     HD did run some tests and admitted that the tests went well.

70.     HD requested that Consoli invest money in producing thousands of kits and that Consoli forward a list of "on hand inventory."

71.     This led Consoli to believe in March 2013 that HD was moving forward with his project.

72.     However, it became apparent over the next several months that HD was, once again, delaying this project.

73.    As noted earlier, Consoli had signed over his agreements with all of the companies that he worked with in order to make this project come together.

74.    HD held the rights and, as a result, Consoli's hands were tied.

75.    Consoli went to Boston because HD owed in excess of $6,500.00 and the invoices for fishing lures, accessories, and kits that Consoli had shipped to them.   HD said that the product had already been shipped to Consoli.

76.    In fact, the product was shipped to Consoli approximately one week after his trip to Boston.  Moreover, a significant amount of the product had been destroyed by HD.

77.    HD failed to act in a manner consistent with the standards of its industry.

78.    HD failed to make reasonable efforts in keeping with the standards of its industry in its efforts to market SkippyFISH.

79.    HD breached its contractual obligations as set forth in the term sheet.

80.    HD failed to honor the terms of an implied contract.

81.    HD breached its covenants of good faith and fair dealing.

82.    HD converted property, the licenses, the rights to intellectual property, agreements, inventory, and money belonging to Consoli.

83.    HD violated Consoli's rights to the fruits and benefits of the agreement reached between HD and Consoli.

84.    HD made material misrepresentations to Consoli about what it would do for Consoli and what Consoli could reasonably expect to receive from its relationship with HD.

85.    At the time that the material misrepresentations were made, HD knew that Consoli would rely upon these representations to his detriment.

86.    HD represented to Consoli that it had experience with fishing lines.

87.     HD represented to Consoli that it would make a significant investment into marketing the product.

88.     HD did not have the experience with fishing lines that it claimed to have.

89.     HD did not invest anywhere near the amount of money that the industry standards suggest that it should invest.

90.     Based upon the failure to make an appropriate investment while tying Consoli's hands, HD destroyed the brand and Consoli's reputation.

91.     HD knew the representations to be false and knew that Consoli would have no way of knowing that they were false.

92.     HD stood to gain by having Consoli agree to work with HD.

93.     Having secured a commitment from Consoli served as leverage that HD could use to secure additional investment from financial sources and other companies.

94.     HD continued to make false promises and representations to Consoli in order to force Consoli to continue in its business relationship with HD.

95.     This allowed HD to continue to leverage its relationship with Consoli to continue to secure financial investment and other companies.

96.     The actions taken by HD and by George have caused significant and irreparable damage to Consoli's brand and to the Skippy FISH brand.

97.     The actions taken by HD and by George have caused Consoli to suffer significant economic harm.

98.     By HD and George's own admission, Consoli should have seen $2,000,000 in profit in the first year alone.

99.     At all relevant times Consoli reasonably relied upon representations and actions made by HD and by George.

100.     On May 31, 2013 HD reassigned the rights regarding Liquid Focus Direct from HD to Skippy.

101.     It was at that time that Consoli recognized that HD and George did not do what they bargained to do.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

102.     Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "101" as if set forth again herein.

103.     Consoli and HD entered into a term sheet.

104.     Consoli fully performed in accordance with its obligations as set forth in the term sheet.

105.     HD failed to honor its obligations as set forth in the term sheet.

106.     As a result therefrom, Consoli has been caused to suffer severe economic injury.

107.     The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION
### BREACH OF AN IMPLIED CONTRACT

108.     Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "107" as if set forth again herein.

109.     Consoli and HD entered into a term sheet and held discussions about entering into a more formal agreement.

110.     In reliance upon representations made by HD. Consoli took acted to his determinant believing a more formal contract would be executed.

111.     HD failed to honor its obligations as promised.

112.     Consoli did everything expected of him.

113.     As a result therefrom, Consoli has been caused to suffer severe economic injury.

114.     The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

### AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
### BREACH OF THE CONVENANT OF GOOD FAITH AND FAIR DEALING

115.     Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "114" as if set forth again herein.

116.     When a party enters into an agreement it has a right to reasonably expect to receive the fruits of that agreement.

117.     Neither party shall do anything that shall have the effect of destroying the right of the other party to enjoy the fruit of the contract.

118.     HD destroyed Consoli's right to enjoy the fruit of the contract.

119.     Consoli did everything expected of him.

120.     As a result therefrom, Consoli has been caused to suffer severe economic injury.

121.     The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION
## NEGLIGENCE

122.  Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "121" as if set forth again herein.

123.  HD and George owed a duty to act with reasonable care in its dealings with Consoli.

124.  This duty arose out of the relationship that George and HD created through its actions.

125.  HD and George failed to act in a reasonable manner.

126.  At all relevant times Consoli acted reasonably.

127.  As a direct and proximate cause of HD and George's negligence, Consoli has been caused to suffer significant economic and emotional harm.

128.  The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION
## CONVERSTION

129.  Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "128" as if set forth again herein.

130.  HD and George took property belonging to Consoli.

131.  HD and George expressly warranted that they would use the property to promote Consoli's business.

132.  HD and George failed to promote Consoli's business in the manner as warranted by HD and by George.

133.   HD and George failed to promote Consoli's business in a manner in keeping with the standards in the industry.

134.   HD and George failed to return Consoli's property.

135.   HD and George have destroyed the value of Consoli's property.

136.   HD and George are responsible to compensate Consoli for the value of his property as if it were properly marketed in keeping with the standards in the industry.

137.   The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

**AS AND FOR PLAINTIFF'S SIXTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE**

138.   Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "137" as if set forth again herein.

139.   Consoli enjoyed relationships with several experts in the marketing field.

140.   At HD and George's insistence, Consoli assigned rights to HD.

141.   By assigning these rights Consoli lost the ability to continue to do business with these entities.

142.   As a result thereof, Consoli lost his business relationships.

143.   As more fully described herein, HD and George destroyed Consoli's brand and his good name and reputation.

144.   HD and George are responsible to compensate Consoli for the value of his property as if it were properly marketed in keeping with the standards in the industry.

145.   The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## AS AND FOR PLAINTIFF'S SEVENTH CAUSE OF ACTION
## FRAUD

146.     Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "145" as if set forth again herein.

147.     HD and George made representations knowing them to be false.

148.     HD and George made these representations knowing that Consoli would rely upon them.

149.     There was no way for Consoli to know that the representations made by George and HD were false.

150.     A reasonable person in Consoli's shoes would have believed the representations to be true.

151.     HD and George deliberately and willfully destroyed Consoli's brand and the SkippyFISH brand.

152.     HD and George realized economic gain in destroying Consoli and SkippyFISH.

153.     HD and George are responsible to compensate Consoli for the value of his property as if it were properly marketed in keeping with the standards in the industry.

154.     The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## AS AND FOR PLAINTIFF'S EIGHTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

155.     Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "154" as if set forth again herein.

156.     HD and George concealed from Consoli the real reason for entering into a relationship with Consoli.

157.    HD and George concealed records from Consoli that would have alerted Consoli to the harms caused by HD and George.

158.    HD and George did not want Consoli to know what its real motives were because it needed Consoli to remain in a business relationship with HD for as long as possible.

159.    HD and George are responsible to compensate Consoli for the value of his property as if it were properly marketed in keeping with the standards in the industry.

160.    The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## AS AND FOR PLAINTIFF'S NINTH CAUSE OF ACTION
### 93A

161.    Plaintiffs reallege and incorporate by reference each and every one of the allegations contained in paragraphs "1" through "160" as if set forth again herein.

162.    HD and George made representations knowing them to be false.

163.    HD and George made these representations knowing that Consoli would rely upon them.

164.    There was no way for Consoli to know that the representations made by George and HD were false.

165.    A reasonable person in Consoli's shoes would have believed the representations to be true.

166.    HD and George deliberately and willfully destroyed Consoli's brand and the SkippyFISH brand.

167.    HD and George realized economic gain in destroying Consoli and SkippyFISH.

168.    HD and George are responsible to compensate Consoli for the value of his property as if it were properly marketed in keeping with the standards in the industry.

169.   A demand letter was sent to the Defendants on April 18, 2016 and more than 30 days have elapsed.

170.   The amount of said damage has not yet been determined but will be in excess of $10,000,000.00.

## DEMAND FOR TRIAL BY JURY

110.   Plaintiffs demand trial by jury.

**WHEREFORE**, the Plaintiffs demand judgment as follows:

    a.   Awarding economic damages in the sum of at least $10,000,000.00;

    b.   Awarding emotional damages in the sum of $1,000,000.00;

    c.   Awarding punitive damages in the sum of $5,000,000.00;

    d.   Awarding treble damages;

    e.   Awarding costs and reasonable attorneys' fees;

    f.   Awarding pre-judgment and post-judgment interest; and

    g.   Awarding all other damages are remedies as this Court deems just and proper.

Dated:  May 19, 2016
       Boston, Massachusetts

                    Yours, etc.

                    THE WAGNER LAW GROUP,
                    A PROFESSIONAL CORPORATION
                    *Attorneys for Plaintiffs*
                    David G. Gabor, Esq. (BBO # 624971)
                    99 Summer Street, 13th Floor
                    Boston, MA 02110
                    Telephone: (617) 357-5200
                    Facsimile: (617) 357-5250